502 S.E.2d 438

Lawrence W. CLEAVER, Administrator
of the Estate of Douglas J.
Cleaver, Appellant,

v.

The BIG ARM BAR & GRILL, INC., West-
field Insurance Company; Robert L. Bu-
racker, Sheriff of Jefferson County,
West Virginia, as Ancillary Administra-
tor of the Estate of Andrew John Haba;
and Erie Insurance Company, Appellees.

No. 24508.

Supreme Court of Appeals of
West Virginia.

Submitted Feb. 17, 1998.

Decided April 2, 1998.

John C. Skinner, Jr., F. Samuel Byrer, Deborah B. Hillyard, Nichols & Skinner, Charles Town, for Appellant.

Catherine D. Munster, Robert W. Trumble, McNeer, Highland, McMunn & Varner, Clarksburg, for Appellee Westfield.

James D. Lamp, Sheryl A. Rucker, Lamp, O'Dell, Bartram & Entsminger, Huntington,

Patrick J. Nooney, Hagerstown, MD, for Appellee Erie Insurance.

WORKMAN, Justice:

Lawrence M. Cleaver, as administrator of his son's estate, appeals from the January 28, 1997, ruling of the Circuit Court of Jefferson County granting summary judgment to Respondents Erie Insurance Company ("Erie") and Westfield Insurance Company ("Westfield") in a post-verdict declaratory judgment action to determine the availability of insurance coverage. Upon a full review of this matter, we affirm the decision of the lower court.

## I.  FACTS

The accident that resulted in Mr. Cleaver's son's death occurred on November 30, 1990. Andrew Haba ("Haba"), a 280–pound college freshman, drank heavily at the Big Arm Bar and Grill until closing time at 2:00 a.m. on the date of the accident. He then drove his vehicle to the Altos Club and parked his car on the berm of the west-bound lane of Route 45. His friends exited the car while he remained inside. One of Haba's friends returned to the vehicle and informed Haba that "everybody was ready to go in." Haba then exited the vehicle, locked the front door, and sprinted diagonally across Route 45 towards the Altos Club. Although he successfully crossed one of the lanes of Route 45, as he attempted to cross the second lane he collided with a Pontiac Fiero driven by Michael Hulbert ("Hulbert"). Both Haba and Douglas Cleaver, a passenger in the Hulbert vehicle, died as a result of the accident.

Mr. Cleaver filed a wrongful death action against Haba, Hulbert, and the Big Arm Bar and Grill. The case proceeded to trial and the jury returned a verdict, finding Haba 80% negligent and the Big Arm Bar and Grill 20% negligent. Hulbert was determined to have no liability in connection with the accident. The jury awarded $1,832,757.99 in compensatory damages and $500,000 in punitives. Erie paid $1.5 million plus interest to Appellant, which sum represents the policy limits of Haba's homeowner's and umbrella insurance policies.[1] Appellant states that as

---

1. The homeowner's policy provided $500,000    worth of coverage and the umbrella policy pro-

of December 15, 1997, the unpaid amount of the compensatory damage portion of the judgment was $484,117.43 plus interest of $103.55 per day.

Following the verdict, Appellant was granted leave by the circuit court to file an amended complaint. Through the amended complaint, Appellant sought a declaratory judgment regarding the applicability of Haba's automobile liability insurance. A favorable declaratory judgment ruling would have made available another $250,000 of insurance proceeds under the automobile liability policy issued by Erie on the Haba vehicle. In addition, it would have permitted Appellant to seek underinsurance proceeds from the insurers of the Cleaver and Hulbert vehicles. The Cleavers have $750,000 [2] in underinsurance coverage through Erie and Hulbert has $100,000 worth of underinsurance coverage through a policy issued by Westfield.

Under the terms of the Erie automobile liability policy, coverage exists *only* if Douglas Cleaver's death is determined to have arisen out of the use of the Haba vehicle. On January 28, 1997, the circuit court granted summary judgment in favor of Erie and Westfield on the issue of whether Haba was "using" his vehicle at the time of the accident. The lower court held that:

The accident which caused Douglas Cleaver's death did not arise out of the ownership, maintenance, use, loading or unloading of Andrew John Haba's vehicle. It thus follows that there is no insurance coverage under the Erie Haba auto liability policy. As Haba was not using his vehicle, he was also not an uninsured or underinsured motorist under West Virginia statute or under the applicable Erie policy. It thus also follows that there is no applicable coverage under the Erie, Cleaver UIM policy or the Westfield, Hulbert UIM policy for the death of Douglas Cleaver.

In his appeal to this Court, Appellant argues that the lower court erred in concluding that the Haba vehicle was not being "used" at the time of the accident and also that Erie is estopped from denying automobile liability coverage based on correspondence issued by an Erie claims representative in December 1991.

## II. DISCUSSION

### A. "Use" of Vehicle

We turn first to the lower court's decision to grant summary judgment on the grounds that the Haba vehicle was not being "used" at the time of the accident. Our standard of review for summary judgment rulings, as we stated in syllabus point one of *Painter v. Peavy*, 192 W.Va. 189, 451 S.E.2d 755 (1994), is "*de novo.*" *See also* Syl. Pt. 3, *Cox v. Amick*, 195 W.Va. 608, 466 S.E.2d 459 (1995) (holding that "circuit court's entry of a declaratory judgment is reviewed *de novo*").

Appellant maintains that the Haba vehicle was being "used" at the time of the accident based on the temporal proximity of the accident to the vehicle's actual use and the causal connection of the vehicle to the accident. Conversely, Erie and Westfield both contend that Haba's "use" of the vehicle had ceased at the time of the accident and therefore, the requisite causal connection does not exist. *See Trent v. Cook*, 198 W.Va. 601, 606, 482 S.E.2d 218, 223 (1996) (stating that " '[c]ases construing the phrase "arising out of the ... use of a motor vehicle" uniformly require that the injured person establish a causal connection between the use of the motor vehicle and the injury' ") (quoting *Baber v. Fortner ex rel. Poe*, 186 W.Va. 413, 417, 412 S.E.2d 814, 818 (1991)); *see also Johnson v. State Farm Mut. Auto. Ins. Co.*, 190 W.Va. 526, 438 S.E.2d 869 (1993) (holding that causal connection between vehicle's use and injury must first be established to invoke coverage under use of non-owned vehicle policy provision).

In support of his position that the Erie automobile liability policy provides coverage under the facts of this case, Appellant cites the policy language stating, "[w]e will pay for damages for which you are legally responsible. These damages must be caused by an

---

vided $1,000,000 worth of coverage.

**2.** This amount represents the total coverage upon the stacking of three separate policies.

accident covered by this policy. The accident must arise out of the ownership, maintenance, use, loading or unloading of an auto we insure." Appellant argues that Haba comes within the policy meaning of "use" since he had driven his vehicle to the location of the Alto's Bar, parked the vehicle in a location that forced him to cross the road, and was hit only a few seconds after he exited the vehicle. Unlike those recent decisions in which this Court has been asked to resolve issues concerning the policy term "use," the Erie policy does not contain language requiring that a person must "occupy" the vehicle for coverage to apply. *See Trent*, 198 W.Va. at 605, 482 S.E.2d at 222; *Adkins v. Meador*, 201 W.Va. at 152, 494 S.E.2d at 919 (1997).

Since the term "use" is not defined by the policy, Appellant looks to cases from other jurisdictions that have found a vehicle to be in "use" where an individual has exited from a vehicle just prior to the accident's occurrence. One such case upon which Appellant places much reliance is *Nationwide Mutual Insurance Co. v. Davis*, 118 N.C.App. 494, 455 S.E.2d 892, *rev. denied*, 341 N.C. 420, 461 S.E.2d 759 (1995). That case involved a six-year-old child who exited a parked van, walked into a one-lane roadway separating the vehicle from a store towards which the minor was heading for ice cream, and was struck by another vehicle. The North Carolina court found that the van was being "used" for purposes of automobile liability coverage based, in part, on the fact that the child had to cross the roadway to reach the store due to the location where the vehicle was parked. *Id.*, 455 S.E.2d at 895; *see also National Indem. Co. v. Farmers Home Mut. Ins. Co.*, 95 Cal.App.3d 102, 157 Cal.Rptr. 98 (1979) (holding that injuries sustained by small child after exiting parked vehicle and running into path of oncoming car arose out of "use" of parked vehicle); *Faber v. Roelofs*,

311 Minn. 428, 250 N.W.2d 817 (1977) (finding that elementary school child's fall under wheels of school bus arose out of "use" of vehicle). Analogizing *Davis* to our present case,[3] Appellant states that because Haba had to cross Route 45 to get to his destination of Alto's, this Court should follow the North Carolina decision and find that the vehicle was being "used" at the time of the accident. *See* 455 S.E.2d at 895.

Erie and Westfield distinguish *Davis* and the other disembarkation cases cited by Appellant based on the heightened duty of care that applies when young children are involved. *See Georgia Farm Bureau Mut. Ins. Co. v. Greene*, 174 Ga.App. 120, 329 S.E.2d 204, 207–08 (1985) (holding that "use" of school bus continues until each child "has crossed any immediate road and is in a place of safety" in view of "duty of extraordinary care and diligence for their safety" owed to minor passengers); *National Indem.*, 157 Cal.Rptr. at 100 ( noting that "[t]he presence of small children in an automobile imposes a particular duty of care and alertness upon the driver in selecting the place for and supervising the manner of discharging the children from the vehicle"). We agree that Appellant's reliance on cases involving young children is misplaced since the attendant elevated standard of care in those cases vitiates their precedential value with regard to our present case.

Citing our recent decision in *Adkins*, Appellant contends that this Court supports an expansive view of the term "use." As proof for this position, he cites the acknowledgment in *Adkins* that "[t]he term 'use' is widely recognized to mean more than driving, or being driven in, a motor vehicle." 201 W.Va. at 153, 494 S.E.2d at 920. Appellant finds further support for his position in the following observations made in *Adkins* regarding the term "use":

3. Appellant urges this Court to rule, like the court in *Davis*, that both homeowner's and automobile liability insurance coverage is available. 455 S.E.2d at 896. In obvious contrast to the policy at issue in *Davis*, however, is the Erie homeowner's policy language that specifically excludes coverage for claims arising from the "use" of a motor vehicle. Thus, Appellant's reliance on *Davis* as authority for the combined

applicability of both automobile liability and homeowner's coverage in the case *sub judice* is clearly misplaced. Moreover, as Erie observes, if automobile liability coverage applies, then Appellant has been unjustly enriched in the amount of $500,000 by his receipt of proceeds under a homeowner's policy that excludes coverage for claims arising from the "use" of a vehicle.

"Use" of a vehicle means to "put into action or service," "to carry out a purpose or action by means of," or "[to] make instrumental to an end or process." *Nationwide Mut. Ins. Co. v. Davis,* 118 N.C.App. 494, 497, 455 S.E.2d 892, 894 (1995); *Webster's Third New International Dictionary* [1976]. " '[U]se' of an automobile by an individual involves its employment for some purpose or object of the user...." *State Farm Mutual Automobile Ins. Co. v. Allstate Ins. Co.,* 154 W.Va. 448, 452, 175 S.E.2d 478, 480 (1970) (quoting *Maryland Cas. Co. v. Marshbank,* 226 F.2d 637, 639 (3d Cir.1955)).

201 W.Va. at 154, 494 S.E.2d at 921.

Appellant omits to refer, however, to our additional recognition in *Adkins* that

"exact definition of the term 'use' is elusive, and is not capable of a definition which will leave everyone 'comfortable.' Whether or not an injury arose from the 'use' of a motor vehicle within the contemplation of a liability policy or statute depends upon the factual context of each case."

*Id.* (quoting *Federated Mut. Implement & Hardware Ins. Co. v. Gupton,* 241 F.Supp. 509, 511 (E.D.S.C.1965), *aff'd,* 357 F.2d 155 (4th Cir.1966)). After considering the various definitions of "use" in *Adkins,* we concluded that " '[u]se' of an insured vehicle implies employing the vehicle for some purpose or object of the user." 201 W.Va. at 157, 494 S.E.2d at 924. We made clear, however, that "[w]h'ether or not an injury arose from the 'use' of a motor vehicle ... depends upon the factual context of each case." *Id.* and syl. pt. 5, in part.

In determining whether the Haba vehicle was in "use" at the time of the accident in this case, we find helpful a four-criteria test used by the court in *Rau v. Liberty Mutual Insurance Co.,* 21 Wash.App. 326, 585 P.2d 157 (1978). To find "use" of a vehicle, the *Rau* court required each of the following factors:

(1) there must be a causal relation or connection between the injury and the use of the insured vehicle; (2) the person asserting coverage must be in a reasonably close geographic proximity to the insured vehicle, although the person need not be actually touching it; (3) the person must be vehicle oriented rather than highway or sidewalk oriented at the time; and (4) the person must also be engaged in a transaction essential to the use of the vehicle at the time.

*Id.,* 585 P.2d at 162 (citations omitted).

Consistent with this Court's prior holdings, the first *Rau* criterion requires a causal connection between the injury and the vehicle's use. Unlike the driver in *Rau,* Haba did not exit his vehicle for the momentary task of seeking directions. 585 P.2d at 162. Haba had used his vehicle for the purpose of reaching the destination of Alto's. Upon parking his car and exiting the vehicle, he had fulfilled the purpose for which he was utilizing his car. Thus, the requisite nexus between the vehicle and the injury is missing. The second *Rau* factor requires a reasonable geographic proximity between the vehicle and the situs of the accident. The evidence presented at trial was that the accident occurred between fifty to seventy-two feet of the vehicle.[4] Given Appellant's failure to meet the other three criteria of the *Rau* test, we make no determination regarding whether this distance is reasonable. Haba clearly fails both the third and fourth prongs of the *Rau* test as he was indisputably highway, rather than vehicle oriented at the time of the accident, and his actions of running diagonally across the highway with the intent to enter Alto's for the purpose of consuming additional liquor demonstrate that Haba was not engaged in a transaction essential to the vehicle's use at the time he collided with the Hulbert vehicle. *See id.* Applying the *Rau* factors to this case, we conclude that the Haba vehicle was not in "use" at the time of the accident.

Another decision which supports our conclusion that the Haba vehicle was not being "used" at the time of the accident is *Bernard*

---

4. While the investigating police officer estimated the distance to be approximately 50 feet between the vehicle and the point of Haba's impact with the Hulbert vehicle, Appellant's expert witness, an accident reconstructionist, testified that the distance was actually 72 feet.

*v. Nationwide Mutual Fire Insurance Co.,* 206 Ga.App. 519, 426 S.E.2d 29 (1992). The decedent in *Bernard* had parked his car at his residence and exited from the vehicle when he was struck by another vehicle about fifty feet from his parked vehicle. In determining whether the decedent was "using" the vehicle for purposes of automobile liability coverage, the court observed:

> We have held that use of the vehicle within the contemplation of a liability policy or statute " 'would seem to extend at least to the point, beyond physical contact, where control over the instrumentality is easily or reasonably at hand, and particularly when it is still being "utilized." ' " *This was not the situation here. The decedent had parked, exited, and relinquished control of the vehicle.*

*Id.,* 426 S.E.2d at 31 (citation omitted and emphasis supplied). Like the court in *Bernard,* we conclude that Haba "had parked, exited, and relinquished control of the vehicle." *Id.*

■ When, as in this case, the "use" of a vehicle is in question for insurance purposes due to the separation of an individual from a vehicle at the time of an accident, the court must determine whether there is a causal connection between the motor vehicle and the injury. In making that determination, the court may consider, but is not limited by, the following factors: a) whether the individual was in reasonably close proximity to the insured vehicle at the time of the accident; b) whether the individual was vehicle oriented as opposed to highway or sidewalk oriented; c) whether the individual had relinquished control of the vehicle; and d) whether the individual was engaged in a transaction reasonably related to the use of the vehicle at the time of the accident. We stress that whether or not an injury arose from the "use" of a motor vehicle depends upon the factual context of each case. The four factors delineated above are instructive guides for finders of fact to follow in evaluating whether an injury arose from the "use" of a motor vehicle, and no one factor carries more weight than the others. Upon application of these principles to the instant case, we affirm the lower court's finding that the

Haba vehicle was not being "used" at the time of the accident.

## B. Estoppel

■ Appellant argues that Erie should be estopped from denying automobile liability coverage based on a letter dated December 5, 1991, from Andrew Rebert, an Erie claims representative, to Appellant's lawyer. Mr. Rebert wrote:

> We agree that the under insured [sic] motorist coverages would potentially be applicable to this loss and that those coverages would be able to be stacked. It is our position that Michael Hulbert and Andrew Haba are joint tortfeasors. Therefore, the auto carrier of Michael Hulbert and Andrew Haba would be involved in settlement along with the homeowner's carrier of Andrew Haba or his parents.
>
> Our under insured [sic] motorist coverages would be *excess* over these policies.

Relying on the statement in this correspondence that "the auto carrier of Michael Hulbert and Andrew Haba would be involved in settlement," Appellant argues that Erie was admitting that the policy it issued to Haba for automobile liability insurance applied under the facts of this case. Given this purported statement of coverage, Appellant contends that Erie cannot subsequently deny coverage under the automobile liability policy.

In explanation of the issuance of the December 5, 1991, document, Erie states that Mr. Rebert wrote this letter in connection with adjusting the underinsured motorist coverage claim made by the Cleavers on their own automobile liability policy issued by Erie. The record reflects that at the time this letter was written, Mr. Rebert had no knowledge regarding the identity of other insurance carriers and the availability of coverage. A separate Erie adjuster in a completely different office was in charge of claims made against Haba's automobile liability policy. Erie asserts that Mr. Rebert had no authority nor the necessary knowledge to bind Erie as to the Haba automobile liability policy when the December 5, 1991, letter was written.

Given these facts, Erie maintains that Appellant cannot demonstrate the elements of equitable estoppel, as defined by this Court in syllabus point two of *Hunter v. Christian,* 191 W.Va. 390, 446 S.E.2d 177 (1994):

"The general rule governing the doctrine of equitable estoppel is that in order to constitute equitable estoppel or estoppel in pais there must exist a false representation or a concealment of material facts; it must have been made with knowledge, actual or constructive of the facts; the party to whom it was made must have been without knowledge or the means of knowledge of the real facts; it must have been made with the intention that it should be acted on; and the party to whom it was made must have relied on or acted on it to his prejudice." Syl. pt. 6, *Stuart v. Lake Washington Realty Corp.,* 141 W.Va. 627, 92 S.E.2d 891 (1956).

Since Mr. Rebert was unaware of Erie's issuance of Haba's automobile liability policy at the time of the December 5, 1991, letter, Erie maintains that the critical element of knowledge of material facts is missing. Not only has Appellant offered no proof to dispute Erie's position that Mr. Rebert was not apprised of the identity of the liability carrier for Haba's vehicle when the December 1991 letter was prepared, but Appellant concedes this very point in its reply brief.

Yet another basis for the inapplicability of estoppel, according to Erie, is Appellant's failure to demonstrate that it relied on this December 5, 1991, letter to his prejudice. This Court elucidated in syllabus point four of *Simmons v. Comer,* 190 W.Va. 350, 438 S.E.2d 530 (1993):

" 'It is essential to the application of the principles of equitable estoppel that the one claiming the benefit thereof establish that he relied to his disadvantage or detriment, on the acts, conduct or representation of the one alleged to be estopped.' Point 2, Syllabus, *Helmick v. Broll,* 150 W.Va. 285, [144 S.E.2d 779] (1965)." Syllabus Point 3, *Nisbet v. Watson,* 162 W.Va. 522, 251 S.E.2d 774 (1979).

Appellant has completely failed to identify either the critical element of detrimental reliance or the resulting prejudice that resulted from such reliance necessary to permit consideration of equitable estoppel principles. The only prejudice that Appellant has suffered resulted from the jury's decision not to assess liability against Hulbert.[5]

Erie contends that it never lulled Appellant into believing that it was providing coverage under the Haba automobile liability policy. As proof of this contention, Erie cites the pretrial letter[6] of counsel for Andrew Haba's estate indicating that she was "defending the Estate of Andrew Haba under the homeowner's policy and umbrella policy." In addition, Erie suggests that Appellant's pretrial demand of 1.5 million—the limits of the homeowner's and umbrella policy limits—demonstrates that Appellant was proceeding under the assumption that coverage under the Haba automobile policy would not be available.

Upon review, we do not find that Appellant has met its burden with regard to establishing the elements necessary to invoke equitable estoppel.[7] *See Hunter v. Christian,* 191 W. Va. at 394, 446 S.E.2d at 181 and syl. pt.

5. As a result of the no liability verdict rendered in connection with Hulbert, Appellant was prevented from collecting $100,000 in underinsurance proceeds from the Westfield policy issued on Hulbert's vehicle. Erie suggests that if it were not for the jury's decision to remove Hulbert from the liability assessment, Appellant would never have initiated the declaratory judgment action in an attempt to gain access to Haba's automobile liability proceeds. The post-verdict timing of the declaratory judgment action seems to support this contention.

6. The correspondence was dated December 17, 1993.

7. We do not address Appellant's secondary estoppel argument that Erie should be prevented from denying coverage based on its failure to issue a reservation of rights under the Haba automobile liability policy as Appellant clearly failed to raise this issue before the trial court and thus, did not preserve this issue for appeal. *See State ex rel. Cooper v. Caperton,* 196 W.Va. 208, 216, 470 S.E.2d 162, 170 and syl. pt. 2 (1996) (stating rule with regard to preserving issues for appellate review).

2. Accordingly, we find no error in the lower court's decision not to apply estoppel.[8]

Based on the foregoing, we affirm the decision of the Circuit Court of Jefferson County.

Affirmed.

8. Although the lower court did not address the issue of estoppel outright in its summary judgment ruling, upon inquiry from counsel the court advised the parties that it had considered the issue of estoppel in rendering its decision.